IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF CHARLIE B. & PAYZLIE B.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF CHARLIE B. AND PAYZLIE B., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ALEXANDRIA C., APPELLANT, AND MICHAEL B. AND SHERRY C., APPELLEES.

Filed June 30, 2026.    Nos. A-25-670, A-25-671.

Appeals from the County Court for Buffalo County: GERALD R. JORGENSEN, JR., Judge. Affirmed.

Tana M. Fye, of FGH Law Office, L.L.C., for appellant.

Carson K. Messersmith, of Klein, Brewster, Brandt & Messersmith, for appellee Michael B.

Mandi J. Amy, Deputy Buffalo County Attorney, and Jerad Murphy, guardian ad litem, for appellee State of Nebraska.

MOORE, PIRTLE, and WELCH, Judges.

PIRTLE, Judge.

## INTRODUCTION

Alexandria C. appeals, and Michael B. attempts to cross-appeal, from the orders of the Buffalo County Court sitting as a juvenile court, adjudicating their two children under Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2024). Alexandria filed a notice of appeal in each child's respective case, and the appeals have been consolidated for the purposes of appellate review. Upon our de novo review of the record, we affirm the juvenile court's order.

- 1 -

BACKGROUND

Alexandria and Michael are the natural parents of two minor children: Charlie B., born in 2021; and Payzlie B., born in 2022. On March 12, 2025, the State filed motions for temporary custody over the minor children alleging that the children's safety was threatened and there was a lack of proper parental care due to the faults or habits of Alexandria and Michael. In support of the motions, the court received an affidavit from Children and Family Services Specialist (CFSS), Schuylar Gomez. The court granted the motions for temporary custody and placement.

On March 13, 2025, the State filed petitions to adjudicate the minor children under § 43-247(3)(a). The petitions alleged that Alexandria and Michael failed to meet the children's needs for physical and emotional safety, placing them at risk of harm.

The petitions also alleged that Alexandria and Michael were previously involved in juvenile matters regarding the children. During the previous juvenile matters, Michael failed to complete the requirements of the case plan and the cases closed with a bridge order placing the children with Alexandria and a parenting plan with provisions for contact with Michael. However, immediately after the closure of the case, Alexandria and Michael married and were noncompliant with the provisions for safety in the parenting plan.

The petitions alleged that Alexandria refused to meet with the Department of Health and Human Services (DHHS) and demonstrated erratic behavior, placing the children at risk of harm. The petitions alleged that the family had a history of substance use and domestic violence and that DHHS did not have access to the children to assess their safety because of Alexandria's refusal to schedule an assessment. A hearing on the matter was held on March 20, 2025. At the hearing both parents entered a denial as to the allegations, and the court set the matter for a pre-adjudication hearing.

Prior to the pre-adjudication hearing, Alexandria submitted several pro se motions in each case, including a notice of intent to file civil rights claims, an emergency motion for immediate hearing, a statement regarding improper placement and disclosure of abuse, and a judicial demand for emergency action and custody. The motion for emergency hearing contained several attachments from the previous juvenile matters; requests for custody of her other minor child, who was no longer a ward of the State; and text messages between Alexandria and CFSS specialist, Gomez. Alexandria made several allegations regarding the children's placement with Emily C., Alexandria's mother, including that Payzlie said Emily's boyfriend "took off her diaper and licked her butt." Alexandria also alleged that Charlie had noticeable bruises, discoloration of the arms and legs, and had irritated genitalia.

At the pre-adjudication hearing, Alexandria asked to represent herself. The State argued that the allegations of abuse had been investigated and that they were not believed to be true. The court requested that each party submit affidavits on the matter about the issue. The court also set a date to discuss the motions for change of placement, which continued to June 20, 2025.

After hearing the testimony of several witnesses, the court overruled the motion for change of placement. The court reasoned that the allegations of abuse were investigated and determined to be unfounded or not disclosed until the time of the hearing. The court also noted that Alexandria fabricated an allegation of abuse in a prior case to undermine placement in that matter. The court

overruled the motion for change of placement and set a date for an adjudication hearing on the matter.

On July 30, 2025, an adjudication hearing was held, during which the following evidence was adduced:

Gomez, a CFSS specialist, testified to receiving an intake connected to Alexandria, Michael, Charlie, and Payzlie on February 24, 2025. Gomez was familiar with the family, because she had worked with them during their previous intake, which resulted in removal for concerns of methamphetamine abuse. Gomez testified that Payzlie was in the hospital due to dehydration, but prior to that she was sick with the flu. However, Gomez clarified the concerns in the intake were not due to Payzlie being sick in the hospital, but rather that Alexandria was irritable, refusing some treatments, and arguing with the staff. Gomez stated that she tried to contact and meet Alexandria for a period of two to three weeks, but that Alexandria was scared and would not meet with her. Gomez stated she was concerned with the way Alexandria was responding and reacting to her messages, as Alexandria would go from being reasonable to "cussing [her] out" and would either not respond or provide lengthy messages that did not make sense.

Gomez testified that she investigated the prior case closure and learned it closed with a bridge order. Gomez said the bridge order gave Alexandria custody of the two children and there were safety agreements in the bridge order. Gomez said that she communicated with family members and child care support during her investigation. Gomez testified that she spoke with Emily, Alexandria's mother, and Emily had concerns about Alexandria's behavior. Gomez said that Emily informed her that there was an altercation between Alexandria and Michael, and Alexandria had a black eye at that point in time.

Gomez recalled that when she went to Alexandria's house during the investigation, she smelled a very strong chemical odor coming from the home. Gomez also said that Alexandria talked about moving to Colorado so that she could get away from this area, and all the judgment that came with it, and DHHS being involved in her life. Gomez stated that at some point after delivering the temporary custody order to Emily, Alexandria came to get her children from Emily, who was watching the children. Gomez testified that Emily informed her when Alexandria was attempting to leave with her children, Alexandria threatened to hurt herself and got into an altercation with Emily.

Gomez testified that after the children were removed, she communicated with Alexandria about setting up visitation, but Alexandria initially refused because she wanted to relinquish custody. Gomez stated that after the first hearing, she indicated she did want to have visitation. Gomez stated after removal, she continued to struggle with Alexandria over communication and considered Alexandria's text messages to be erratic. Gomez testified that both Alexandria and Michael said they would get drug tested prior to the removal, but they never provided DHHS with drug test results.

Gomez stated that the bridge order was put in place because Michael did not make any progress during the case. Gomez said that at the time of the bridge order, Michael had a warrant out for his arrest and DHHS was concerned about continued drug use and that he was in legal trouble. The bridge order stated that Michael was to have parenting time with the children (1) if he addressed his warrants, (2) if the visits were supervised (Alexandria was not allowed to supervise the visits), (3) if the visits were not overnight, and (4) if the visits were at his father's

house during the day on Saturdays and Sundays only. The bridge order explicitly stated that the parenting plan could only be modified through the process of mediation, but that mediation could not begin until Michael had appropriately addressed warrants, criminal charges, and alcohol/drug issues.

Gomez said that during her investigation she spoke with Charlie. Charlie told her that Michael was living with them, despite the bridge order safety plan. Gomez also said she had concerns about continued domestic violence and that from previously working with the family their behavior now was similar to their behavior during methamphetamine use. Gomez stated that she determined the children were unsafe. Gomez testified that there were several safety threats, including the pattern of investigations or removals for the family, the concern of domestic violence, the concern of possible drug use, and that Alexandria was fleeing with the children to the point where Gomez could not assess them.

Miranda Lamer, a caseworker with DHHS, testified to being assigned to the Charlie and Payzlie cases. Lamer testified that she struggled to communicate with Alexandria and that throughout her attempts to work with the family, she received argumentative and threatening messages. Lamer said that she was concerned about substance abuse and mental health. Lamer stated that neither parent demonstrated sobriety to DHHS. Lamer said, as a part of an intake related to a case through the DHHS hotline, she received a screenshot of messages Alexandria sent that referenced her frustration with the case and wanting to harm her caseworker's children. At trial, Alexandria and Michael objected to the evidence on the basis of relevance, hearsay, and foundation. The court received the messages over objection. The screenshot received in the intake said "[T]his is Alexandria [B.] and I am seriously about to hunt my caseworkers [sic] kids down [and] kill them and then myself."

Lamer stated that she was concerned with Alexandria's mental health or potential substance abuse as the messages she received went off on tangents or did not make sense. Lamer also said at one point, after she informed Alexandria of a decision DHHS had made regarding the case, that Alexandria threatened her. Lamer testified that Alexandria sent a message saying, "[Lamer] was lucky . . . it was 5:00, because if it wasn't, [Alexandria would] be going to jail." Shortly after seeing this message Lamer got a notification from the front desk of her office that Alexandria was there to meet with her.

Emily, Alexandria's mother and the current foster parent, testified about her concerns with Alexandria and Michael. Emily said that when Alexandria returned with Payzlie from the hospital, Alexandria told her about an argument she had with Michael. Alexandria said Michael threw out Payzlie's car seat and she did not have a car seat for Payzlie. Emily also stated that when Payzlie was in the hospital, Alexandria was worried about leaving Michael alone with Charlie, as she was afraid Michael was inappropriately touching Charlie.

Emily stated that Alexandria would get very upset talking to Gomez because of her trauma from the previous case. Emily said that Gomez reached out to her and tried to figure out how to calm Alexandria down to communicate with Gomez. Emily stated that Alexandria said that "if [she] had to deal with DHHS again, [she was] going to blow [her] fucking brains out." Alexandria also told Emily that "[she] can't believe anything the State does . . . [t]he State's out to get me." Emily said that Alexandria told her at one point that Emily needed to buy Alexandria a car so "that she could get the hell out of the state" and "I'm going to take my kids, and I'm going to go because

- 4 -

I'm not going to deal with DHHS." Emily stated at this point she was concerned that Alexandria might harm herself or the children, because she was getting more agitated.

Emily testified that Alexandria started her car and put it in reverse while she was standing there, and it felt like Alexandria was trying to run her over or get her out of the way. Emily slapped Alexandria and attempted to put the car in park and get the keys out. Alexandria pushed and kicked Emily and then left with the children. After this altercation, Emily called the sheriff. Emily stated that Alexandria returned to her house, yelling and screaming, to collect some items she had left behind. Emily reported the incident to Gomez. Emily said she did not have drug concerns initially, but later she did when the police located Alexandria at what she believed to be a known drug dealer's location.

Emily said that during the week when Payzlie was in the hospital, Alexandria had sent her a picture of her black eye through text messaging. Alexandria and Michael both objected to the introduction of the photo on the basis of foundation, arguing that there was not enough information on when the photos were taken. The court received the evidence and opined that "It'll go to its weight. You're correct. We [do not] know when they were taken, simply they were sent that day, and the representation was that they . . . just happened." Emily testified that Alexandria told her that "this is what [Michael] did to me." Emily also testified that she heard the altercation over the phone, that she could hear both Alexandria and Michael yelling and screaming at each other. Emily said that they told her different stories about what happened with Alexandria saying that Michael punched her and Michael saying that Alexandria pushed her and she fell.

Emily testified that Alexandria had told her prior to the case reopening that she and Michael got into an argument, where he "beat the shit out of her, or he had slapped her, or he had pushed her." Emily said that all these events happened while Alexandria had care and custody of Charlie and Payzlie.

Emily said that Alexandria and Michael's home was messy. Emily stated that dishes would be piled up, the kitchen floor was sticky, there was laundry everywhere, and the bathroom was very dirty. Emily said that while Charlie and Payzlie had their own bedroom, it lacked a bed, and the children would sleep in Alexandria and Michael's bedroom. Emily also said that at some point Alexandria told her there was something wrong with the bathroom and the plumbing was not right.

Emily stated that she was concerned about Alexandria's substance abuse. Emily stated that, although Alexandria never admitted that she was using substances, she would say things like "I messed up, I'm not doing well, or I'm having trouble coping." Emily stated that when Alexandria said these things she would speak very erratically and that based on her past behavior and drug use, this was a sign that Alexandria was using drugs. Emily also stated that Alexandria told her she was concerned about Michael using drugs. Emily said that Alexandria would tell her that she would not get along with Michael, he would never be home, or he would go out all night, and that it was because he was using drugs.

Kinley G., Michael's daughter and Charlie and Payzlie's half sibling, testified to having to take care of Charle and Payzlie because of Alexandria's housing issues, car issues, or other mental and emotional issues. Kinley was 19 years old at the time of the hearing. Kinley said that she noticed Alexandria's black eye when Payzlie was in the hospital. Kinley stated that Alexandria told her that Michael had given her the black eye, because Alexandria told Emily over the phone that she thought Michael was abusing Charlie and Michael overheard the conversation and

punched her. Kinley said that on the topic of abuse Alexandria had told her that Charlie displayed inappropriate behaviors, Payzlie would not want to sleep in the same bed as Alexandria and Michael, and that Michael would want Charlie to ride in his lap at his job site.

Kinley testified that she was concerned about Alexandria and Michael using drugs because of Alexandria's behavior and Michael showing up to the hospital smelling strongly of marijuana. Kinley said that Alexandria had told her, after asking her to watch the children, that Michael did not stay at their home, because he was "high." Kinley stated that on March 26, 2025, she went over to Alexandria and Michael's home and Michael smelled strongly of marijuana and was high.

Alexandria testified about the condition of her home and her efforts to provide a safe and clean environment for her children. Alexandria said that she and Michael married on August 29, 2024, after the closure of the last case. Alexandria said that she married Michael, because he was doing extremely well and making changes to be a safe caregiver for their children. Alexandria stated that she did not believe she violated her bridge order in any way despite her interactions with Michael. Alexandria testified that the only reason she freaked out at the hospital is because the hospital staff wanted to give Payzlie a catheter. Alexandria testified that she did not contact Gomez because she did not want to deal with DHHS again and did not need their assistance. Alexandria said that the children were staying in different places, because they were currently renovating their home due to a mold problem.

Alexandria testified to how she received her black eye. Alexandria said that she was in the garage on her phone, when it slipped out of her hand. Alexandria said she went to catch it and hit her eye on the workbench in the garage. Alexandria testified that Michael did not hit her. Alexandria also testified that she never told Emily or Kinley that Michael had hit her. Alexandria denied that she and Michael were using drugs. Alexandria testified that she left Emily's home when Emily tried to physically stop her from leaving and broke her key off in the ignition, because she did not want to meet with Gomez.

At the close of the hearing, the court noted that considering all the evidence, two different people testified that Alexandria told them she got a black eye from physical violence imposed by Michael. The court also noted that there was testimony about potential substance abuse. The court opined that Alexandria denied substance abuse and domestic violence, and that the court found it concerning.

The court also opined that a fraud was perpetrated on the court because Alexandria "scrapped" the bridge order and did not follow it whatsoever. The court found that Alexandria was specifically directed to not involve Michael in the minor children's life and was not qualified to make the determination that Michael had "fixed himself." The court adjudicated both Charlie and Payzlie and found the children are ones as described in § 43-247(3)(a).

Alexandria and Michael appeal.

ASSIGNMENTS OF ERROR

Alexandria assigns the juvenile court erred in finding there was sufficient evidence to adjudicate the minor children pursuant to § 43-247(3)(a).

In his attempted cross-appeal, Michael, as appellee, assigned that (1) the juvenile court erred in admitting certain evidence that violated due process and prejudiced the parents in adjudicating the minor children pursuant to § 43-247(3)(a), and (2) the juvenile court erred in

finding there was sufficient evidence to adjudicate the minor children pursuant to § 43-247(3)(a). As an appellee attempting to file a cross-appeal, Michael was required to follow the procedures outlined in the Nebraska Supreme Court rules, which he failed to do. See Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2021). Therefore, we will not consider Michael's assigned errors except as in support of the arguments raised by Alexandria.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Manuel C. & Mateo S.*, 314 Neb. 91, 988 N.W.2d 520 (2023). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Draygon W. et al.*, 31 Neb. App. 400, 980 N.W.2d 648 (2022).

## ANALYSIS

*Sufficient Evidence.*

Alexandria and Michael assign that the juvenile court erred in finding sufficient evidence to support adjudication, because the evidence showed the removal was based on Alexandria's and Michael's previous patterns and the prior removal of the juveniles by DHHS.

To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Draygon W. et al., supra*. While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id.* The State must prove such allegations by a preponderance of the evidence. *Id*.

Section 43-247(3)(a) sets forth numerous grounds by which the juvenile court could take jurisdiction over a juvenile. *In re Interest of Draygon W. et al., supra.* The grounds alleged in the petition here, which the juvenile court found were proved by sufficient evidence, included that the children lacked proper parental care by reason of the faults or habits of Alexandria in that she neglected or refused to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of the juveniles; or Alexandria is in a situation or engages in an occupation dangerous to life or limb or injurious to the health or morals of such juveniles. The petition also alleged that Alexandria and Michael failed to comply with their bridge order from the previous case, refused to meet with DHHS, and that the family had a history of substance abuse and domestic violence, placing the minor children at risk for harm.

Based on our de novo review of the record, the State presented ample evidence to establish that the children are within the meaning of § 43-247(3)(a). After the conclusion of the prior juvenile cases, Alexandria and Michael agreed to a bridge order to ensure the safety of the minor children. Two months after the implementation of the bridge order and safety plan, Alexandria and Michael became non-compliant with the order and plan. Alexandria also repeatedly avoided and refused to meet with DHHS, despite repeated attempts to do an initial intake assessment. Alexandria also sent "erratic" text messages and threatened the lives of her caseworker and her caseworker's children.

Most importantly, two separate witnesses testified that Alexandria had told them that Michael punched her and gave her a black eye. Although Alexandria testified that she hit her eye against a workbench, when evidence is in conflict in a juvenile case, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of facts over the other. See *In re Interest of Draygon W. et al.*, 31 Neb. App. 400, 980 N.W.2d 648 (2022). The court opined on the record that it found Alexandria's denial of domestic abuse concerning, and we give weight to the fact that the juvenile court, after hearing Alexandria's testimony, found it concerning and accepted the State's witnesses' version of the facts.

Further, the court found that Alexandria's refusal to meet with and avoidance of DHHS was tantamount to flight in criminal cases. Alexandria also threatened to harm herself and others at the idea of working with DHHS and displayed other behaviors that support a finding that either she was lacking mental stability or using illegal substances. Alexandria also claimed that she and Michael were not using illegal substances, but several witnesses reported instances where they believed Alexandria and Michael were using illegal substances. Alexandria and Michael did not provide any drug tests to DHHS despite promising to provide them. Alexandria also told multiple people she was intent on fleeing Nebraska with the minor children to escape working with DHHS.

Based on the foregoing, we find that the juvenile court did not err in finding sufficient evidence to adjudicate the children under § 43-247(3)(a).

*Michael's Cross-Appeal*

Before addressing the deficiencies in Michael's cross-appeal, we first set forth the chronology of the appeal. Alexandria filed a notice of appeal on August 29, 2025. Michael filed a notice of appeal that same day, but after Alexandria had filed her notice. In response to Michael's notice of appeal, the clerk of the Supreme Court sent a letter to the Buffalo County Court and copied all attorneys of record, advising them that pursuant to Neb. Ct. R. App. P. § 2-101(C) (rev. 2021), multiple appeals from the same case could not be docketed. The clerk advised, "Therefore, the notice of appeal filed by [Michael] shall be treated as a second notice of appeal in the above-captioned matter." This is in accord with § 2-101(C), which states:

> Method of Docketing Case; Multiple Appeals from Same Case Prohibited. Upon receipt of the material required by § 2-101(B), the Clerk shall thereupon docket the case designating as appellant or appellants the party or parties first having filed the notice of appeal in the court from which the appeal is taken. All other parties shall be designated as appellees, and any attempt to appeal thereafter made by any party to the action shall be filed in the existing case and not separately docketed.

Alexandria filed a "Brief of Appellant" on December 17, 2025. Michael filed a "Brief of Appellee" on January 29, 2026. The State filed a "Brief of the Appellees" on February 25, 2026. No further briefing occurred.

In Michael's brief, he assigned errors and sought affirmative relief, but there is no designation of a cross-appeal on the cover of the brief, nor is a cross-appeal set forth in a separate division of the brief as required by Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2021), which section states in full:

Where the brief of appellee also presents a cross-appeal, it shall be clearly noted on the cover of the brief. Within the appellee's brief, the cross-appeal shall be set forth in a separate section of the brief. This separate section shall be headed "Brief on Cross-Appeal" and shall be prepared in the same manner and under the same rules as the brief of appellant. See § 2-109(D)(1). Where an appellee submits a brief purporting to be a brief of appellant, which complies with the rules regarding an appellant's brief, and the appellee's brief does not take issue with any errors asserted by the appellant, the appellate court may, in its discretion, treat the brief of such appellee as a brief on cross-appeal.

In *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999), the Supreme Court declined to consider a father's arguments appealing the termination of his parental rights, because he failed to properly designate his arguments as a cross-appeal. As in the present case, the father filed a notice of appeal after the mother did so, making him an appellee. The father set forth assignments of error in his brief, which he entitled simply "'Brief of Appellee.'" *Id.* at 144, 602 N.W.2d at 450. In its refusal to consider the father's assignments of error, the court explained that "the appellate courts of this state have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee." *Id.* at 146, 602 N.W.2d at 451. And it had "repeatedly indicated that a cross-appeal must be properly designated, pursuant to [§ 2–10]9(D)(4), if affirmative relief is to be obtained." *Id.* at 145, 602 N.W.2d at 450. The court further cautioned parties seeking appellate review of their claims to be aware of the rules governing appeals, noting that "[a]ny party who fails to properly identify and present its claim does so at its peril." *Id.* at 147, 602 N.W.2d at 451.

We note that in the present case, after Michael filed his notice of appeal, the appellate clerk notified him that his notice of appeal would be treated as a second notice of appeal and referred him to § 2-101(C). This rule advised Michael that he would be designated as an appellee, and he correctly designated himself as an appellee on his brief. Therefore, this case is governed by *In re Interest of Natasha H. & Sierra H., supra*, and is distinguishable from *Knaub v. Knaub*, 245 Neb. 172, 512 N.W.2d 124 (1994) and *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990). In both *Knaub* and *In re Application A-16642*, the parties filing second notices of appeal mistakenly designated their briefs as briefs of appellants. Here, Michael correctly identified his brief as that of an appellee, but he failed to comply with the proper filing of a cross-appeal. Section 2-101(E) instructs an appellee on how to assert a cross-appeal, stating: "Cross-Appeal. The proper filing of an appeal shall vest in an appellee the right to a cross-appeal against any other party to the appeal. The cross-appeal need only be asserted in the appellee's brief as provided by § 2-109(D)(4)."

Based on our court rules, Michael, as an appellee, was required to identify his cross-appeal on his brief and in a separate section in compliance with § 2-109(D)(4). As in *In re Interest of Natasha H. & Sierra H., supra*, we decline to waive the rules on his behalf and to award him affirmative relief. Because Alexandria and Michael both assigned as error the court's decision adjudicating Charlie and Payzlie, however, we considered Michael's argument on this issue in addressing Alexandria's assigned error earlier in this opinion.

CONCLUSION

We conclude that the juvenile court did not err in adjudicating the children in regard to Alexandria and Michael. Because Michael did not properly designate his brief as a cross-appeal, we do not address his other assigned error. Accordingly, the court's orders are affirmed.

AFFIRMED.